CASE 83—SURETIES, RELEASE—JANUARY 12, 1884.

# Connecticut Mutual Life Ins. Co. v. Scott, &c.

### APPEAL FROM LOUISVILLE CHANCERY COURT.

1. The mere reappointment of Ryan as agent of appellant was not, in the absence of the failure of Ryan and Carpenter, a representation of his financial honesty, upon which the sureties on the bond might rely as a release from the obligation of their bond after its breach.

2. The sureties were entitled to good faith at the hands of appellant, and no more. This they received in all that directly pertained to the execution of their bond, and as both seemed to be merely negligent and not fraudulent, appellees, as sureties for Ryan, have in that regard no ground for complaint.

3. But after the bond was executed, when appellants discovered the defalcation of Ryan and Carpenter, in April, 1878, it was their duty at once to notify appellees of the fact. Appellees can not be held bound to appellant for any failure of duty by Ryan after appellant discovered the defalcation mentioned and failed to disclose it to appellees.

4. Appellant knew that after the execution of appellees' bond as sureties for Ryan he took his son into partnership with him in the insurance business. The introduction of the son as such, with the knowledge of appellant, was a clear violation of their contract with appellees as his sureties, and released them from their obligation for the faithful conduct by Wm. Ryan of the business, and who was alone to transact it.

5. The knowledge of the president and secretary of appellant is the knowledge of the company employing them.

BULLOCK & ANDERSON AND H. C. PINDELL FOR APPELLANT.

Appellant did not know that at the time the bond was executed Ryan, Carpenter & Co. were in arrears with appellant, nor did it know who were to become the sureties of Ryan until after the bond had been executed.

If appellant did know that Ryan, Carpenter & Co. were in arrears, it was under no obligation, unless inquired of, to communicate such knowledge to appellees. (2 Otto, 97; 18 Wis., 667; Home Ins. Co. v. Holway, The Reporter, vol. 12, p. 12; 3 Houston, Del., 474; 91 Ills., 518; 12 Clark & Fin, 118; 10 Exch. 522.)

A surety on a bond to a corporation is not discharged by the fact that the principal had, before the bond was executed, committed frauds upon the corporation, if such frauds were unknown to the officers of the corporation, although they may be guilty of gross negligence in not discovering them. (116 Mass., 275; 52 Penn. St., 343; 2 Met., Mass., 522; 6 Mo., 472.)

There was no partnership between Wm. Ryan and W. E. Ryan. The name of Wm. Ryan & Co. was a name assumed by Wm. Ryan for his own convenience. (Story Part., secs. 18, 182; 6 Conn., 347; Parsons Part., 229; Collier Part., sec. 183; Lee v. Lashbrook, 8 Dana, 214.)

Sureties are not released by the employes' *laches* in not making known the subsequent defaults of the principal. (59 Penn. St., 350; 18 Wall, 662; 9 Wheat, 720; 11 *Ib.*, 184; Brand Suretyship and Guaranty, 619; 2 Del., 375; 3 Houston, 535; 4 Wash. C. C., 678; 52 N. Y., 88; 5 Ins. Law Jour., 824; Taylor v. Bank Ky., 2 J. J. Mar., 564; 30 Gratt., 218; 3 Halstead, 1; 59 Ga., 685.)

A debtor has the right to direct the application of payments made by him. (4 Mason, 333; 5 *Ib.*, 82; 10 Vroom, 539; 2 Gray, 298; 36 Ver., 329; 8 Wend., 403; Helm v. Commonwealth, 79 Ky., 67; 125 Mass., 15; 26 Mo., 232.)

The intention of the parties in relation to the application of payments may be inferred from circumstances when it has not been expressly declared. (8 Wend., 403; 5 Mason, 449; 13 Ver., 15; 5 W. & S., 542.)

Rules established by corporations for periodical payments are for their own security, and not for the benefit of sureties. (9 Wheat, 720; 59 Penn. St., 350.)

BROWN & DAVIE, RUSSELL & BARRETT, YOUNG & TRABUE, AND W. O. & J. L. DODD, FOR APPELLEES.

1. After the bond was delivered, Ryan, with appellant's consent, took in a partner, thereby releasing appellees as sureties.

2. As soon as appellant discovered the defalcation of Ryan, Carpenter & Co., in April, 1878, and failed to notify appellees, from that moment appellees were released as surety of Ryan.

The general principle that any act done or acquiesced in by the obligee that increases the risk of the surety, operates to release him. (Calloway v. Snapp, 78 Ky., 563; 3 Campbell, 53; 6 Adol. and E., N. S., 514; 15 Com. B., 203; 113 Mass., 194; 9 Wheat, 702; Brant on Suretyship, 137; 39 Me., 542; 1 Don., 272; 10 Vroom, 947; Graves v. Nat. Bank Lebanon, 10 Bush, 33; 64 N. Y., 386; 34 Ind., 18; 9 Wheat, 720; 11 *Ib.*, 188; 1 Peters, 323; 18 Wall, 662; 60 Mo., 476; 2 Otto, 94.)

3. When the money was deposited by Ryan in bank, to the credit of the company, that moment it became the property of the company, and the condition of the bond which appellees stipulated should be performed was then accomplished. When Ryan remitted the exchange, and thereby handed to the company its own money, he had no power to direct what the company should do with it. (State v. Atherton, 40 Mo., 221.)

In the application of payments the debtor can apply as he chooses. If he fails to do so, the creditor applies as he chooses. If neither make the application, the law will make it.

But to the foregoing rules there is an exception in cases of persons giving succession bonds with different sets of sureties, in which cases the money must be applied to discharge the obligation for the year or term for which it was collected, and for the relief of the sureties of that term.

AUTHORITIES CITED.

(Clayton's case, 1 Mer., 528; Collins v. Gwynne, 9 Bing., 544; Attorney General v. Manderson, 6 Morris, P. C. C., 239; U. S. v. January, 7 Cranch, 572; U. S. v. Kirkpatrick, 9 Wheat, 720; Postmaster General v. Furbur, 4 Mason, 333; U. S. v. Wordwell, 5 Mason, 82; Boody v. U. S., 1 W. and M., 150; Myers v. U. S., 1 McLean, 493; U. S. v. Linn, 2 McLean, 501; U. S. v. Eckford's Ex'rs, 1 How., 250; U. S. v. Jones, 7 How., 688; Paw Paw v. Eggleston, 25 Mich., 36; Detroit v. Weber 29 Mich. 24. Independent School v. McDonald, 39 Iowa, 564; State v. McCormack, 50 Mo., 570; Boring v. Williams, 17 Ala., 523; Commonwealth v. Rietzel, 9 W. and S., 109; Stone v. Seymour, 15 Wend., 19; Pickering v. Day, 3 Houston, 537; Colerain v. Bell, 9 Met., 499; Chapman v. Commonwealth, 25 Gratt., 721; State v. Sooy, 10 Vroom, 539; McDaniel v. Barnes, &c., 5 Bush, 183; City of Paducah v. Cully, 9 Bush, 323; Helm v. Commonwealth, 79 Ky., 67; Skilman v. Miller, 7 Bush, 428; Jones v. Gallatin Chy., 78 Ib., 491.)

CHIEF JUSTICE HARGIS DELIVERED THE OPINION OF THE COURT.

Ryan as principal, with Scott and Leathers as his sureties, executed bond to the appellant company in the penal sum of $20,000, stipulating for the faithful discharge of duty by Ryan as the agent of appellant.

This action was brought by appellant on the bond, alleging as a breach thereof that Ryan as agent had collected and failed to pay or account for the sum of $20,427.64, received after the execution of the bond and before his discharge, and that he had not kept true and accurate accounts of his receipts and disbursements. These allegations were controverted by the sureties, who also pleaded various matters, which will be hereinafter considered, as a discharge from their obligation.

At the date (March 18, 1875) of the execution of the bond, Ryan and Carpenter, who had prior thereto been agents for the appellant, were liable for more than $21,000

on their agency; but neither the appellant nor the sureties had any actual knowledge of that fact. The appellant, however, could, by the use of proper business diligence, have discovered it. This is the first point to be determined. We are satisfied that the failure to use such diligence, and inform the sureties of the results before they became bound, was not a fraud, there being no purposed suppression of the fact, or intentional failure to investigate Ryan & Carpenter's accounts to avoid learning their condition. The mere reappointment of Ryan as agent was not, in the absence of knowledge of the failure of Ryan & Carpenter, a representation of his financial honesty upon which the sureties could rely as a release from the obligation of the bond after its breach. It was more their duty than that of appellant to make inquiry of Ryan's condition before they bound themselves for him, and they can not, therefore, complain of appellant's failure to investigate his accounts. They were entitled to good faith at the hands of appellant, no more. This they received in all that pertained directly to the execution of the bond, and as both were simply negligent, not fraudulent, in their conduct, the sureties have no legal or equitable ground for complaint on that score. (Magee v. Manhattan Life Ins. Co., 2 Otto, 97.)

The appellant did not solicit the sureties to execute the bond. There was no intercourse between them or its officers, prior to the execution of the bond, that would have required the disclosure by it of any fact which would have lead to the discovery of the condition of Ryan & Carpenter's accounts, and the sureties did not seek any information at the hands of appellant as to the state of those accounts.

And as the silence of the appellant, in the absence of knowledge of the indebtedness of Ryan & Carpenter, could

not have amounted to an express affirmation or negation with reference to that fact, there is, according to Story's Equity, secs. 214, 215, and the case of Ætna Life Insurance Company v. Mabbett and another, 18 Wisconsin, 698, an entire failure by appellees to make out the charge of fraud, the appellant not being guilty of suppressing or failing to disclose any fact within its knowledge which, increased the risk of the sureties.

The circumstances prior to and attending the execution of the bond do not raise the inevitable inference of deception upon the part of appellant or its officers, and the fact alone of Ryan's reappointment being insufficient to uphold the allegation of misrepresentation, there can be no doubt on this point.   The bond was bindingly executed.   (Hamilton v. Watson, C. and F. House of Lords Reports, 109.) In April, 1878, the appellant discovered the indebtedness of Ryan & Carpenter, for which they were jointly and severally bound, yet, without notifying his sureties, retained Ryan as agent, entrusting business to him in the usual course until November, 1878, when the appellant discharged him.

The authorities are conclusive that the sureties can not be held bound for any failure of duty by Ryan occurring after the discovery in April, because the appellant failed to communicate the knowledge it had acquired to the sureties. And were authority obscure on this point, principle would sustain it, because nothing could be more repulsive to common honesty than for the appellant, with knowledge that the agent was violating his bond and putting to extreme hazard the rights of his sureties, to allow him to proceed in his course without notifying them of the facts, so they might refuse to consent, and take steps to protect themselves. Nor is it any answer that the appellant requested Ryan, who

promised to do so, to communicate his own dereliction to his sureties, for that shows no reasonable effort by appellant to inform the sureties.  (Phillips v. Foxhall, L. R., 7 Q. B., 666; Sanderson v. Aston, L. R., 8 Excheq., 73; Franklin Bank v. Cooper, 39 Me.; Graves v. National Bank of Lebanon, 10 Bush, 23.)

Shortly after the execution of the bond Ryan began a course of business as agent, which was calculated to convince strangers that he and his son were partners in the agency.

It is contended by counsel that the appellant did not consent to the formation of the partnership, or know of its existence, if it even existed, which is denied.  But there is a rule of common sense, as well as lawful and logical presumption, requiring that material acts and things, which from the facts themselves, or circumstances surrounding them, ought to be known, will be treated as understood; and it is applicable to the facts bearing upon this controverted point.

A brief recitation of them will be sufficient argument to show that the appellant knew, or ought to have known, of the existence of the partnership, and actually acquiesced in its conduct of the business of the agency.

The correspondence between Ryan and the appellant was principally in the name of Wm. Ryan & Co.  The letterheads and envelopes used in the correspondence represented Wm. Ryan and his son, Wm. E. Ryan, as partners.  They were so advertised by the appellant, or under its direction, by printing done at its home office.  Remittances were sent by letter over the signature of Wm. Ryan & Co., and, by the sign of their office and ostensible mode of carrying on the business of the agency, the ordinary evidences of a partner-

ship were held out to the world by them.    It is not a satisfac-
tory answer to the printed and other evidence of the existence
of the partnership, brought home to the appellant, to say that
the firm name of Wm. Ryan & Co. represented Wm. Ryan
alone, that being the style in which he preferred to do busi-
ness, when such representation is in contravention of the
general reasonable and fair purpose of a firm name, and, if
approved, would furnish an easy mode of disproving, with
comparative impunity, the existence of a partnership, al-
though conducted in the usual way and attended by potent
public evidences of that relation.    Great force is imparted
to the allegation that the partnership really existed, and the
appellant knew it by the fact that Ryan, at the beginning of
his agency, applied to the company's officers to allow him
to admit his son as an ostensible partner for the purpose of
giving him social or commercial consequence.    By that
application the appellant was made aware of Ryan's desire
to take his son in as a partner, and so soon as he began to
conduct the business in a firm name that would naturally
embrace his son, it was the duty of appellant, having knowl-
edge of it, to take notice of the fact, and forbid the use of
such partnership *indicia* which was calculated to hold Wm.
E. Ryan out to the world as a partner, and give him legal
control of the assets and business.    An ostensible or nomi-
nal partner has as much control, and his acts are as binding
in the conduct of the business of the partnership, so far as
the world is concerned, as a real partner, if he be held out
to the world as a real partner.    The admission of such a
partner is a violation of the contract with the sureties, and
a reasonable and proper regard for their interest demanded
that the appellant should have prevented the conduct of the
business by Ryan & Co., or notified the sureties of their
danger.

The appellant agreed in the bond that the business should be conducted by Wm. Ryan alone, and not by him and his son for whose acts the sureties might not have been willing to bind themselves. The introduction of the son as a real or ostensible partner was a clear violation of the contract; for, as said in London Assurance Corporation v. Bold, "engaging for the good conduct of one man and engaging for the good conduct of two are essentially different engagements, both in ordinary understanding and legal effect." (See 6 A. and E., p. 523.) In that case the sureties, on precisely such a bond in legal effect, and on the same plea as in this case, were released.

Lord Ellenborough, in Bellairs and Another v. Ebsworth, 3 Campbell, 55, said: "The defendant was surety for Phillip Nott, and not for Mingay, Nott & Co. When the plaintiff entrusted their agency to the new firm, the defendant's responsibility was at an end. He by no means undertook for the good conduct of any future partner with whom P. Nott might associate," and adjudged that the sureties were released by the act of the obligee in entrusting the agency to the firm. That case is in accord with Parham Sewing Machine Company v. Brock, 113 Mass., 197, in which it was held that the introduction of a new person to purchase machines and manage the business with Delano, for whose conduct the sureties had engaged, "was a material change in the conduct of the agency and the liability of the sureties," the court saying: "While they might be willing to be sureties for Delano, . . . . it does not follow that they can be bound, or have consented to be bound, for the acts of any one whom Delano may have taken into partnership." These authorities, which are based on sound principle, sustain the rule that seems to us to be indisputable, that

the introduction of the son, Wm. E. Ryan, as a partner,
with the consent, acquiescence, or knowledge of the appel-
lant, and without the consent of the sureties, released them
from their obligation for the faithful conduct of Wm. Ryan
alone, whose agency and control of the business was, accord-
ing to the agreement contained in the bond, to be single,
and not open to admission or intrusion of others for whom
the sureties might have refused to become bound.    It is true
that the appellant appointed Wm. Ryan only as its agent,
but that is not the disputed or essential question upon which
this decision must turn.    The point in issue is, whether the
appellant, having entered into a contract with the sureties
appointing Wm. Ryan alone as agent, and agreeing that he
should conduct the business of the agency, permitted or
submitted to his act of adding a partner in the transaction of
the business, whose subsequent conduct was such as to
authorize the world to trust him as a partner and to inform
the appellant that he was acting in that capacity.

While Wm. Ryan had the right to appoint clerks and
assistants, whose acts and control of the business were his
in law, yet he had no right to treat his son as a partner,
imparting to him, by holding him out to the world as such
through advertisement, letter-heads, and firm signature re-
mittances by checks, and the general methods of performing
the business of the agency, equal original authority over the
business with himself.    It seems that the appellant was
aware of two important facts bearing upon the question of
its knowledge of the partnership and the effect it might have
upon the obligation of the sureties.    It knew of Ryan's de-
sire to take his son in as a partner, and of his use of the
firm name, which naturally embraced his son; and it was
particular to attempt to protect itself from the consequences

by keeping the business on its own books, in the name of Wm. Ryan alone. Why? Certainly because it had doubts of the alleged confined meaning of "Wm. Ryan & Co." It must have known or believed that that name did not represent Wm. Ryan alone, as it now contends was the case, and it should have been equally particular as to the rights of the sureties, and absolutely prohibited its use and the manner of conducting the business of the agency by Ryan, or notified them thereof, so they could have proceeded to release themselves, denied his right so to act, or consented to his conduct. While they may have done neither, yet not been bound, still this was appellant's course to secure their consent or acquiesence, without which they could not be held liable for the acts of the partnership.

The fact that Wm. Ryan caused insurance license to be issued to Wm. Ryan & Co. was another act public in its nature, and doubtless known by appellant, that tended to place the business under the unlawful control of another whose good conduct was not insured by the terms of the bond. This fact, therefore, instead of aiding appellant, increases the reasons for believing it had knowledge of the partnership, for the existence of the license in the firm name might have led to the ascertainment of the partnership. We can not doubt, from the facts traced to the appellant, that it knew, or purposely closed its eyes so it could not know that Ryan was doing the business of the agency with his son as partner. And it will not be allowed to draw a distinction between the knowledge of its president and other officers who transact the daily business of the company, and knowledge received by its board of directors in official session, for the purpose of escaping the effect of such knowledge. There are two good reasons for disallowing such a

distinction in a case like this—first, because information coming to the officers elected by the board, and entrusted with the daily transaction of the business of the company and those who deal with it, and which is necessary or naturally connected with its performance, and which such officers are in duty bound to disclose to the board, must be treated as the information of the board and binding upon it; second, because, if this were not so, all advantages would be given the company in admitting or denying the information, which might never find its way to the board in official session or in its technically official capacity, although its president and other officials might possess the information, and be the only channel through which it could ordinarily be communicated to the board. Notice, therefore, to such agents, in the transactions in which they are employed, is notice to the company employing them. (Angell and Ames on Corporations, secs. 305, 306, 308; Schenck v. Mercer Co. Ins. Co., 4 N. J., 447.) From any point of view we are forced to conclude that appellant had notice of the partnership or the acts of Wm. Ryan, which were sufficient to induce the world to believe his son was a partner, and to give him that social and commercial consequence which would flow from a joint control of the business.

Had Ryan kept false or inaccurate accounts, whereby the appellant was prevented from receiving the money collected by him, it would have constituted a breach of the bond; but the manner of keeping the accounts by Ryan did not divert any of the money from appellant. It enabled him and the appellant to unjustly apply the proceeds of business done after the execution of the bond to the antecedent indebtedness of Ryan & Carpenter, for whom the sureties were never bound, and thus create a deficiency which the

sureties ought not to bear.   If the accounts were falsely kept, the appellant had every reason to know the object. It was the beneficiary.   There was a strong motive for it to allow Ryan to pay up the old indebtedness of Ryan & Carpenter, which was not secured, with funds that should have been credited on the business for which these sureties were bound, and then turn upon them for the purpose of holding them responsible for the deficiency thus created, because in that way the sureties would really have to pay the old indebtedness of Ryan & Carpenter by accounting for a seeming but insubstantial defalcation of their principal.   The strictness of the company in urging returns· by Ryan as its agent, and the large amounts, pressed as he was, which he was placing to the credit of Ryan & Carpenter, and leaving the business he was then doing evidently behind, must have convinced the appellant, as it would any reasonable person, that he was diverting the funds for which the sureties were bound to the payment of that old debt of Ryan & Carpenter.

Thus the appellant received every dollar the sureties contracted it should receive; but it claims the right to the entered credits on Ryan & Carpenter's indebtedness, because Ryan directed them so to be made and appropriated his remissions in that way.   It is not necessary to discuss his right to make those appropriations; for whether he made them in fact or not, or whether, under the circumstances exhibited by the record, he could have lawfully exercised such a power without the consent of his sureties, and while the appellant had no notice of the indebtedness of Ryan & Carpenter, the sureties are released because of the admission of the son of Wm. E. Ryan as a partner, for the reasons above given.

But we do not mean to intimate that Ryan had any such

right of appropriation in law, even if appellant was free from the imputation that it understood the condition of affairs by the large remittances and credits which Ryan was placing on the past transactions of Ryan & Carpenter, and had the resolution of the appellant company never been adopted, by which it was declared that when the agent deposited funds collected by him they could not be checked out to any one else save the appellant, or withdrawn from the bank without its consent.

In arriving at the conclusion which we have, we are consoled by the fact that the release of the sureties inflicts no injury upon the appellant, because it has really received all the money collected by Ryan after they became bound for him, and the sureties will receive in justice and equity what they ought to have been credited with from the beginning.

Wherefore, the judgment is affirmed.